IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EFFIE J. FRAZIER,                    )
                                     )    No. 04-359-HU
            Plaintiff,               )
                                     )
      v.                             )
                                     )  FINDINGS AND RECOMMENDATION
JO ANNE BARNHART, Commissioner)
of Social Security,                  )
                                     )
            Defendant.               )
_____)

Max Rae
P.O. Box 7790
Salem, Oregon 97303
      Attorney for plaintiff

Karin Immergut
United States Attorney
District of Oregon
Craig J. Casey
Assistant United States Attorney
888 S.W. Fifth Avenue, Suite 1000
Portland, Oregon 97204-2024

Jeffrey Baird
Special Assistant United States Attorney
701 Fifth Avenue, Suite 2900 MS/901
Seattle, Washington 98104
      Attorneys for defendant

HUBEL, Magistrate Judge:

      Effie Frazier brought this action pursuant to Section 205(g)

FINDINGS AND RECOMMENDATION Page 1

of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying her application for disability insurance benefits.

## Procedural Background

Ms. Frazier filed an application for disability insurance benefits on September 28, 1999. She was insured for benefits through the date of the decision. She alleges disability since June 15, 1998, based on physical and mental impairments. Her application was denied initially and upon reconsideration. A hearing was held on July 31, 2000, before Administrative Law Judge (ALJ) Mason D. Harrell, Jr. On August 25, 2000, the ALJ issued a decision finding Ms. Frazier not disabled. Three and a half years later, on January 21, 2004, the Appeals Council notified Ms. Frazier that it had denied her request for review, making the ALJ's decision the final decision of the Commissioner.

## Factual Background

Born October 22, 1958, Ms. Frazier was 41 years old on the date of the decision. She obtained a Bachelor's degree in 1991. Her past relevant work is as a fishery biologist, laboratory assistant, office assistant, and cotton gin/warehouse locator. She has not worked full-time since June 15, 1998, but began working part-time in January 2000.

## Medical Evidence

On June 15, 1998, Ms. Frazier complained to her primary care physician, osteopath Douglas Eliason, M.D., of chest pain. Tr. 312.

FINDINGS AND RECOMMENDATION Page 2

She was directed to the emergency room. <u>Id.</u> On August 3, 1998, she complained again to Dr. Eliason of chest pressure and shortness of breath over the last couple of months. Tr. 309. She had also had an episode the previous week in which her left hand went numb. <u>Id.</u> Ms. Frazier told Dr. Eliason she had not been feeling well, with increasing fatigue, somewhat poor sleep, and emotional lability. <u>Id.</u> When asked about stressors, she

> became tearful and tells me that she has had this ongoing problem with work where she feels like as the only black person in the office that she frequently encounters situations where co-workers make comments, supervisors have made comments that make her feel uncomfortable. This is an ongoing thing and has finally built up to the point where she feels like she can't continue working. She was off for almost the entire month with leave hoping that she would feel better but she doesn't.

<u>Id.</u> Upon examination, Ms. Frazier's lungs were clear; heart rate and rhythm were regular without murmurs. Dr. Eliason diagnosed probable panic disorder, occupational stress, and depression. <u>Id.</u> He started her on Paxil and excused her from work through August 11. She was given a Holter monitor to "reassure that there is no cardiac problem;" it was noted that she had had a treadmill test in April as part of an employment physical, which had been normal. <u>Id.</u>

Dr. Eliason saw Ms. Frazier again on August 10, 1998 for follow-up on depression and anxiety. Tr. 308. Her Holter monitor was unremarkable. She reported that she did not feel she could go back to work. <u>Id.</u> Dr. Eliason excused her from work for an additional two weeks, through the 24th of August. She was advised that it might be another week before the Paxil began working. He also referred her to a psychiatrist, Hung Tran, M.D. <u>Id.</u>

FINDINGS AND RECOMMENDATION Page 3

Ms. Frazier saw Dr. Tran on August 17, 1998. Tr. 279. She told Dr. Tran she was having problems with chest pain, shortness of breath, nervousness, headache, and nausea. Id. She said she was experiencing stress at work. Ms. Frazier related an incident in which a co-worker walked by her cubicle and hit her in the back; she wrote an e-mail to the co-worker, who came over and apologized. Id. Ms. Frazier said the episode was strange to her because in seven years of working together, this had not happened before. She related another incident in which a co-worker elbowed her in the side; when Ms. Frazier confronted her, the co-worker apologized. And Ms. Frazier related that earlier, in March, when her supervisor was on vacation, a supervisor from another team demanded a report from her a week before it was due; he came to her work space and shouted her, causing her to feel threatened and intimidated. When she complained to her supervisor, he referred it to his manager, who eventually concluded that Ms. Frazier was "sensitive." Id.

Ms. Frazier reported having panic attacks two or three times a day and not sleeping well. Id. Dr. Tran observed that her speech and motor behaviors were "retarded, anxious, shaking, and tearful." Tr. 280. She described her mood as "anxious, uptight." Her thought process was slightly disorganized, but there was no delusional ideation. Ms. Frazier denied suicidal ideation or homicidal ideation. She showed no psychotic symptoms. Id.

Dr. Tran diagnosed Panic Disorder without Agoraphobia. He thought that "[a]dditional psychosocial history may help understand why she is vulnerable to having anxiety at this time." He arranged

FINDINGS AND RECOMMENDATION Page 4

to review medical records, prescribed Xanax to be taken with the Paxil, and extended her medical leave for another week, to August 31, 1998. Id.

Ms. Frazier reported to Dr. Eliason on August 24, 1998 that she felt better when at home, but thoughts of going to work made her begin to feel anxious. Tr. 307. However, she thought the Paxil was helping her to calm down, as she was getting less of the chest pressure, pain, and shortness of breath. Id. Dr. Eliason gave her a note putting off her return to work through September 24.

Dr. Tran saw Ms. Frazier again on August 27, 1998. Tr. 281. She reported that Dr. Eliason had extended her medical leave for another month, and that she had been off work since the end of June. Id. Ms. Frazier said she was sleeping a little better with the medication and was not having anxiety attacks unless she thought about work or communicated with her workplace. Id. Dr. Tran maintained her on Xanax and Paxil and suggested that she practice diaphragmatic breathing. Id.

On October 1, 1998, Dr. Eliason wrote a letter on Ms. Frazier's behalf. Tr. 288. he stated that Ms. Frazier had been his patient for approximately three years, and that her diagnosis was panic disorder "exacerbated by occupational stress and depression." Id. he estimated that Ms. Frazier would be under treatment "probably for the remainder of her life." Id. Dr. Eliason did not anticipate that Ms. Frazier would be able to return to her work for at least six months, "until her condition is stabilized and/or her work situation changes." Id. Dr. Eliason thought it possible that

Ms. Frazier could return to work after a re-evaluation in six months, "but at this point that is impossible to determine." Id. He said she was currently taking Paxil and Zanax. Id. Dr. Eliason noted that she was going to continue seeing Dr. Tran. Tr. 289.[1]

Ms. Frazier saw Dr. Eliason on January 7, 1999, for complaints of lower abdominal pain during the past three days, headache, and a rash. Tr. 305. Dr. Eliason diagnosed irritable bowel syndrome and prescribed Levbid, along with Indocin for the headache.

On February 3, 1999, Dr. Eliason saw Ms. Frazier for recurrent chest pains and a "little bit" of numbness in her hands bilaterally. Tr. 304. Examination was normal. Dr. Eliason doubted that the chest pain was cardiac, and thought the numbness in the hands was of unknown etiology. He prescribed Flexeril for the chest tightness and ordered an echocardiogram and lab work to check for hyperthyroidism. Id. According to a chart note dated February 9, 1999, the thyroid test was "OK." The echocardiogram showed some left ventricular hypertrophy, with normal chamber size and valves. Tr. 303. Ms. Frazier was started on Lisinopril along with the Maxzide for blood pressure. Id.

On March 4, 1999, Dr. Eliason wrote that Ms. Frazier wanted to discuss a return to work. Id. Although "[h]er medicine seems to be helping her some," she "gets fairly upset even thinking about the idea of returning to work." Id. Dr. Eliason noted that he was

---

[1] Although Ms. Frazier told Dr. Turco in July 1999 that she saw Dr. Tran three times, the administrative record shows only two visits, on August 17 and August 27, 1998.

FINDINGS AND RECOMMENDATION Page 6

considering returning Ms. Frazier to work "just to see how she will do," perhaps a staged return on a half time basis. Id.

On May 4, 1999, Ms. Frazier was again seen by Dr. Eliason for abdominal pain, now of three months' duration; pain in both hips, soreness behind her right elbow, and a request to have her blood sugars checked. Tr. 303. Dr. Eliason suspected that the abdominal pain was irritable bowel syndrome, but thought it could reflect gallstones. Id. He thought the pain in her arm was triceps tendinitis. Id. He prescribed Levbid, telling her that if her pain did not resolve, he would set her up for a HIDA scan for her gallbladder. Id. He prescribed Naprosyn and recommended stretching for the hip pain. Id.

On June 15, 1999, Ms. Frazier saw Dr. Eliason for complaints of bilateral foot swelling and itching and continued abdominal pain despite the Levbid. Tr. 301. Dr. Eliason diagnosed idiopathic edema in her feet and referred her to Dr. Schultheiss for the abdominal pain. Id.

On July 22, 1999, Ronald Turco, M.D., performed an independent psychological examination of Ms. Frazier for her employer. Tr. 323-31. In addition to a clinical examination, he reviewed Dr. Eliason's medical records, administrative reports, and a job description. Tr. 323.

Dr. Turco noted that Ms. Frazier had been absent from work since June 22, 1998, and that her treating physician had diagnosed a panic disorder, a diagnosis with which Dr. Turco strongly disagreed. Id. Dr. Turco noted that Ms. Frazier was not currently

in treatment with regard to any psychotropic medications or counseling. Id. He noted,

> This is indeed unfortunate, because it has further pushed Ms. Frazier towards a disability status. She has not had an opportunity to "work through" some of her concerns and some of the anger she has experienced in terms of her perceptions of employment with the Bureau of Land Management and she is also not being treated psychopharmacologically.She did have a consultation with a psychiatrist, Dr. Tran, and saw him on three occasions. He administered medications, as did Dr. Eliason, but the patient either has not been compliant in taking them or they were discontinued. The medications were Paxil and Xanax, which are psychotropic drugs used to treat depression and anxiety.

Id.

Ms. Frazier described several incidents and comments at work which she felt were racially hostile and inappropriate. She also felt that her complaints to management were not being acknowledged or acted upon. Ms. Frazier took a vacation in June 1998, but when it was time for her to return to work, she had stomach problems, headaches and chest pains. Tr. 327. She was currently taking Maxzide and Zestril for hypertension and a cardioregulatory drug. Tr. 328. She said she might be willing to return to work at BLM if she could begin working at home, but that she could not work with the same supervisors or coworkers. Id. She felt that she could return to a job, but not with the same individuals. Id. She was convinced that no one would listen to her and that no one was concerned about her well-being. Id. When asked if she would work in a different resource area, she said the work would be difficult because she would not be familiar with the job, and so she would not be willing to take such a position. Id.

FINDINGS AND RECOMMENDATION Page 8

Currently, Ms. Frazier was participating in the "usual household duties," as well as regular attendance at church on Sundays and Bible study on Wednesday. Tr. 329. She reported that her husband's family had recently had a very large reunion, and many of the relatives stayed at her home. Id.

Dr. Turco wrote:

> You will note that her physician, Dr. Eliason, appears to have exaggerated some degree of racial and other discrimination that may have occurred. Certainly there were inappropriate comments, but not sufficient to generally produce a psychiatric disturbance. They do seem to have produced a disturbance with Ms. Frazier, however, as she is an intensely sensitive individual and certainly has responded with a degree of anxiety. I find no indication, past or present, that she has suffered from a panic disorder. I do not believe that this woman should consider permanent disability and an encouragement in this regard will simply entrench her into a disability status which is indeed unfortunate with a well educated 40-year-old woman who has a great deal to offer...

Id. Dr. Turco agreed that Ms. Frazier should not return to her usual place of employment because of problems associated with her interactions with coworkers. Id. While Dr. Turco thought that much of what she described appeared to be typical workplace banter, "clearly she is extremely sensitive and possibly this is because of her racial background." Id. He did not think Ms. Frazier was going to change. Id. Although Dr. Turco thought Ms. Frazier could not return to work with the same co-workers and supervisors, he thought she was capable of working at any other job for which she was technically suited at the BLM.

In Dr. Turco's opinion, Ms. Frazier had "some degree of deficits with regard to her self esteem and unfortunately these have come to focus in the context of the employment situation." Id.

FINDINGS AND RECOMMENDATION Page 9

He thought important that she receive adequate treatment, consisting of medication and "psychotherapy to deal with her anger towards the work place and her sense of inferiority," neither of which she was currently receiving. Id.

Dr. Turco administered the Minnesota Multiphasic Personality Inventory (MMPI). It reflected a "considerable degree of paranoia, anxiety, and depression." Id. Dr. Turco thought Ms. Frazier's test results indicated a "substantial sense of discomfort," and that she was a "shy, self-conscious individual who is socially avoidant and socially alienated." Id.

In Dr. Turco's opinion, Ms. Frazier needed to be under the care of a competent psychiatrist "to assist her both psychologically and with regard to medications." Id. Dr. Turco thought that with substantial treatment she might or might not be able to return to work, "because her perception of the work place is essentially hostile and I doubt very much whether this perception will change under any circumstances." Id.

Dr. Turco diagnosed anxiety disorder with depressive elements and passive dependent personality disorder with difficulties in dealing with anger. Tr. 331.

On September 7, 1999, Ms. Frazier saw Edward H. Schultheiss, M.D., a gastroenterologist, for evaluation of her abdominal complaints. Tr. 335-38. She described two sorts of pain syndrome, the most common being a right upper quadrant discomfort, and the other being a less frequent severe generalized abdominal pain accompanied by nausea and clammy skin. Tr. 338. After physical

FINDINGS AND RECOMMENDATION Page 10

examination, Dr. Schultheiss's assessment was "fairly nonspecific pain complaints." Tr. 337. He did not think the right upper quadrant discomfort was typical of gallbladder disease, and he was reluctant to pursue additional gallbladder tests at that time. Id. Ms. Frazier's lab tests did show a "very mild elevation of AST and I wonder about hepatic steatosis accounting for capsule stretch and some of the symptoms." Id. He did not think an upper endoscopy was indicated. Tr. 335.

In a letter to Dr. Eliason, dated September 7, 1999, Dr. Schultheiss observed that it was "a little difficult to classify her symptoms exactly as much of them have a sort of functional character." Tr. 339. Dr. Schultheiss thought she might improve with Levsin, though he noted that she had not responded to Levbid. Id.

On September 17, Ms. Frazier saw Dr. Eliason for complaints of vertigo over the last four or five days. Tr. 362. The chest pain of which she had complained previously was diminished. Id. Physical examination was normal. Id. Dr. Eliason diagnosed headache and vertigo of unknown etiology. He ordered an MRI of the head to rule out stroke or tumor as a cause for the vertigo. Id. Dr. Eliason did not think the anxiety disorder was the cause of the symptoms. Id.

On September 22, 1999, Ms. Frazier was notified that the MRI was normal. Id.

At a follow-up visit to Dr. Schultheiss on September 28, 1999, Dr. Schultheiss recorded that the interval work-up included normal iron saturation studies, negative hepatitis C test, and mildly elevated AST, stable at 44. Tr. 335. Dr. Schultheiss decided to

order an ultrasound of the gallbladder and an upper endoscopy. Tr. 334.

On October 22, 1999, Dr. Schultheiss saw Ms. Frazier for a continued complaint of tenderness in her neck following the endoscopy. Tr. 334. Dr. Schultheiss told Ms. Frazier that the upper endoscopy showed a small hiatal hernia, but no active esophagitis. Id. The ultrasound showed evidence of a fatty liver and AST remained mildly elevated. Id.

Dr. Schultheiss noted that the chronic right upper quadrant discomfort was probably caused by hepatic steatosis. Tr. 333. He told her that steatosis alone would not progress, and that if hepatic steatosis was the cause of the discomfort, it would improve with weight loss. Id. The upper endoscopy showed no acid peptic disease, and the ultrasound did not indicate problems with the gallbladder. Id.

In May 2000, Dr. Eliason referred Ms. Frazier to a psychiatrist, Rebecca Ricoy, M.D. Tr. 384. On May 31, 2000, Ms. Frazier told Dr. Ricoy she was experiencing continued anxiety about work. Tr. 412. Ms. Frazier told Dr. Ricoy she and Dr. Tran "did not connect well," and that Paxil caused her to feel apathetic. Id. Dr. Ricoy diagnosed major depression in partial remission and panic disorder. Tr. 416.

Ms. Frazier saw Dr. Ricoy again on June 20, 2000. Tr. 411. She reported that she was not sleeping well and having palpitations. Tr. 411. She and her husband were in marriage counseling. Id.

On June 27, 2000, Ms. Frazier disclosed that she was not sure

FINDINGS AND RECOMMENDATION Page 12

what to do about her job because she did not feel ready to return. Id. She said she remained unable to get out of bed on a consistent basis. Id.

On July 11, 2000, Ms. Frazier told Dr. Ricoy her employer had terminated her leave and told her she had to either return to work or resign. Tr. 410. Ms. Frazier felt pessimistic about being able to handle the job, but wanted to try. Id. On July 11, 2000, Dr. Ricoy wrote a letter on Ms. Frazier's behalf, asking that she be allowed to return to work for no more than 20 hours a week. Tr. 417. In addition, Dr. Ricoy recommended that Ms. Frazier be given a private office as an accommodation, to minimize distractions and "the unwanted interactions that were previously occurring at the workplace," as well as "reduce her fears of intrusive touching." Id.

On July 15, 2000, Dr. Ricoy completed a document entitled, "Medical Source Statement" for Ms. Frazier. Tr. 380-82. The Statement asked for an assessment of a claimant's capacity to perform basic mental activities of work on a sustained basis. Tr. 380. "On a sustained basis" was defined as 40 hours per regular work week less a reasonable time daily for lunch and breaks. Id. Dr. Ricoy rated Ms. Frazier "fair"[2] in the following categories: 1) ability to remember work-like procedures; 2) ability to understand

---

[2] The form defines "fair" as "Substantial loss of ability to perform the named activity in regular, competitive employment and, at best, could do so only in a sheltered work setting where special considerations and attention are provided. Tr. 380.

and remember very short and simple instructions; 3) ability to carry out very short and simple instructions; 4) ability to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; 5) ability to ask simple questions or request assistance; 5) ability to make simple work-related decisions; 6) ability to be aware of normal hazards and take appropriate precautions; and 7) ability to respond appropriately to changes in a routine work setting. She rated Ms. Frazier as "poor"[3] in 1) the ability to maintain attention for extended periods of two hour segments; 2) the ability to sustain ordinary routine without special supervision; 3) ability to work in coordination with or proximity to others without being unduly distracted by them; 4) ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; and 5) ability to accept instructions and respond appropriately to criticism from supervisors. Dr. Ricoy commented:

> Not focusing well or completing things. Has felt targeted by others and has difficulty moving through these feelings. Anxiety symptoms would interfere with performance on a consistent basis. Not yet well treated. May be able to handle part-time work.

Tr. 381. Dr. Ricoy's diagnoses were major depression with severe anxiety and possible panic disorder. Tr. 382. In response to the

---

[3] The form defines "poor" as "Complete loss of ability to perform the named activity in regular, competitive employment and in a sheltered work setting; could do so only to meet basic needs at home." Tr. 380.

question, "Has the patient's condition existed and persisted with the restrictions at least as severe as outlined in this ... statement since at least June 30, 1998?" Dr. Ricoy wrote, "Yes. According to patient report." She thought Ms. Frazier's condition was temporary. Id.

On July 19, 2000, Ms. Frazier told Dr. Ricoy that her employer was unable to accommodate Dr. Ricoy's recommendations, so Ms. Frazier had not returned to work. Tr. 410. Ms. Frazier told Dr. Ricoy she was "ready to consider meds." Id. Dr. Ricoy tried her on Effexor. Id. Dr. Ricoy agreed to meet with Ms. Frazier and her supervisor to discuss accommodation. Id.

Ms. Frazier saw Dr. Ricoy on July 27, 2000, reporting that she was a little tired, nervous over the past couple of days, and concerned about the side effects of the medication. She said she was unable to function at home, and "felt like [she] was losing it." Tr. 409.

### Hearing Testimony

Ms. Frazier testified at the hearing that she had been working part-time since January 2000. Tr. 426. She was currently working 16-20 hours a month, although between January 2000 and May 2000, she worked 10-15 hours per week. Tr. 427. She testified that she reduced her hours because "I had just decided that I was just going to make myself do some work because I felt like I had to do something. And it was just way more than I could do." Tr. 427-28. She explained that she was doing in-home care for elderly people, and was bothered by headaches, nausea, body aches, bulging in her

FINDINGS AND RECOMMENDATION Page 15

stomach, and anxiety attacks. Tr. 428.

Ms. Frazier testified that she was still being treated by Dr. Ricoy, and taking Effexor. Tr. 430-31. However, she did not feel she was well enough to extend her hours. Tr. 432. Ms. Frazier said she didn't do much work around the house. Id. She said she cooks "every now and then" and does laundry "maybe once a month." Tr. 433. However, her daughter and her husband help her. Id. She does not leave the house to go shopping because she feels that people are always trying to run over her with their carts or, if she gets to the counter, people won't wait on her. Tr. 433. Ms. Frazier said "usually five minutes or so is about all I can handle in the store." Tr. 438. She said she has difficulty getting along with "everybody I know." Tr. 433.

Ms. Frazier said she had received a letter from the BLM saying she had to decide whether she was going to return to her job by July 14, and that she could not go back. Tr. 433. However, she said she had not yet been terminated. Id. Ms. Frazier acknowledged that her job at the BLM was not one in which she could be isolated, as she had to be in the field about 25-35 percent of the time and had to interact with coworkers. Tr. 435.

Ms. Frazier said she was able to do her current work because she could choose the days and hours on which she worked. Tr. 436. She is currently caring for one client, a 56-year-old man with an amputated leg. Tr. 441. She cleans his house and does his dishes and his laundry on a once-a-week basis, about four hours a day. Id.

The ALJ called a medical expert, Prasana Pati, M.D. In

FINDINGS AND RECOMMENDATION Page 16

response to a question from Dr. Pati, Ms. Frazier said she goes to church about two Sundays a month, attends Bible study on Wednesday night, and sometimes attends a church business meeting, but does not go on other outings with her family. Tr. 439, 443-44.

The medical expert, Dr. Pati, opined that Ms. Frazier had an adjustment disorder with depressive features and an anxiety disorder not otherwise specified (NOS). Tr. 445. He disagreed with Dr. Ricoy's findings on the Medical Source Statement, stating that he thought Ms. Frazier was only moderately impaired in her ability to 1) carry out very short and simple instructions; 2) maintain regular attendance and be punctual; 3) sustain ordinary routine without special supervision; 4) complete a normal workday and workweek; 5) make simple work-related decisions; and 6) respond appropriately to changes in a routine work setting. Dr. Pati characterized "moderate" limitations as not precluding the ability to perform work. Tr. 447. Dr. Pati disagreed with Dr. Ricoy's opinion that Ms. Frazier had poor or no ability to maintain attention for extended periods, based on Dr. Turco's opinion that Ms. Frazier did not have significant psychiatric symptomatology and based on the likelihood that she would improve with continued psychotherapy and drug treatment under Dr. Ricoy. Id.

Dr. Pati thought Ms. Frazier was capable doing a job that involved simple repetitive tasks with no interpersonal interactions except occasional exposure to the public. Tr. 449. However, Dr. Pati thought Ms. Frazier was not currently capable of working full-time. He testified that "down the road, if she improves, she should

be able to" work full-time, tr. 450, and that he did not disagree with Ms. Frazier's "perception that she's not able to do more hours than she currently is." Tr. 456. Dr. Pati further opined, based on Dr. Turco's report, that Ms. Frazier had been capable of handling a 40-hour a week job until April or May of 2000, the time that she began treatment with Dr. Ricoy, tr. 452, and that she would be capable of returning to full-time work by May 2001:

> By that period of time [i.e., one year after beginning treatment with Dr. Ricoy] she should be able to go back to a full-time job in some other situation. ... She's a qualified person and-- ... I don't like her to see the disabled status, like Dr. Tutco [sic] stated. She could go on a disability status, but I like to project her as functioning in a job at least by May of 2001, provided she [inaudible] treatment....

Tr. 457.

Ms. Frazier's husband testified that he and their daughters "try to force her to do things, you know, when she's going to lay around and do nothing. ... [W]e try to ... make her get out of the bed, to do things, you know, and just go out in the backyard or something, working ... in the garden or something." Tr. 459. Mr. Frazier testified that he did not feel Ms. Frazier was getting better because "I wouldn't consider that as ... getting better because now she got to take pills in order to function." Id. He testified that he did not see a "whole lot of difference" between the present time and the previous year. Tr. 460. Mr. Frazier testified that Ms. Frazier's participation in church activities had begun to decline about three or four months after she left BLM, when she "got to the point where she didn't want to do anything." Tr. 461. He explained that after she does her part-time job, "it

FINDINGS AND RECOMMENDATION Page 18

seemed like that picked everything out of her," so that she is too tired to do household chores. Tr. 461.

The ALJ called vocational expert (VE) Patricia Ayerza. Tr. 462. He asked her to consider an individual 41 years old with a B.S. degree, but limited to simple repetitive tasks "in a non-public setting where there'd be no interpersonal interactions required with anyone" and not working for the BLM. Id.

The VE testified that Ms. Frazier could not return to her previous work, but that she could do unskilled work at the medium exertional level. Tr. 463. She offered the examples of hand packager, laundry worker, and janitorial jobs. Id. On cross-examination, Ms. Frazier's attorney asked the VE how she understood the "no interpersonal interactions" limitation, and the VE answered that "part of what I understand has to do with what he explained I think it was at the prior hearing." Tr. 464. The VE explained that "as my working relationship with him is developing ... it doesn't necessarily mean you can't have any public contact or you can't have contact with other individuals, but it's more of an in-depth interpersonal type relationship." Id.

The ALJ then clarified that what he meant by no interpersonal interactions was that giving and receiving simple instructions would not be precluded, but that more complicated interpersonal situations such as receiving complaints from the public would be precluded. Tr. 465.

When the VE was asked to consider the limitations set out on the Medical Source Statement filled out by Dr. Ricoy, she stated

FINDINGS AND RECOMMENDATION Page 19

that they would require a sheltered workplace, which was not inside the normal labor market. Tr. 468. She explained, "[Y]ou have to deal with other human beings in almost every job in the labor market. If a person is so incorrigible or has so-- such problems dealing with people that it's going to cause some kind of incident, then yeah, that's definitely a problem in retention of employment." Tr. 470.

## ALJ's Decision

The ALJ found no evidence that Ms. Frazier had a severe physical impairment. He based this finding on the February 28, 2000 office note from Dr. Eliason indicating that Ms. Frazier's hypertension and irritable bowel syndrome were under control; the evidence of the pelvic ultrasound that was normal except for a small uterine leimyoma; the absence of any sign of cardiopulmonary disease; the normal cranial MRI; the unremarkable abdominal ultrasound; the upper endoscopy showing only a small sliding hiatal hernia; and the ruling out of any apparent physical basis for Ms. Frazier's right upper quadrant pain. Tr. 40. The ALJ concluded that Ms. Frazier had the residual functional capacity to perform a physically unlimited range of work activities. Tr. 40.

With respect to Ms. Frazier's mental status, the ALJ noted the conflicts between 1) Dr. Eliason's diagnosis of probable panic disorder, 2) Dr. Tran's diagnosis of panic disorder without agoraphobia, 3) Dr. Turco's "strong disagreement" with the diagnosis of panic disorder and his own diagnosis of anxiety disorder with depression, 4) Dr. Ricoy's diagnosis of major

depression, severe anxiety, and a possible panic disorder, and 5) Dr. Pati's opinion that Ms. Frazier had an adjustment disorder with depression and an anxiety disorder. Tr. 41-42. The ALJ accepted Dr. Pati's opinions and concluded that Ms. Frazier had the mental residual functional capacity to perform simple, routine and repetitive tasks which required no interpersonal contact with supervisors or co-workers and only superficial contact with the general public. Tr. 42. The ALJ further found, based on Dr. Pati's testimony, that Ms. Frazier was capable of performing work on a full-time competitive basis before May 2000, and that commencing May 2000, she had been limited to working no more than 20 hours per week. Id. However, he found that Ms. Frazier's condition was expected to improve with current treatment and medication and was not expected to last for 12 or more continuous months. The ALJ based this finding on the opinion of Dr. Pati and on Dr. Ricoy's opinion on the Medical Source Statement that Ms. Frazier's work limitations were "temporary," based on the history given by "patient report."

The ALJ found Ms. Frazier's testimony about debilitating mental symptoms not credible, based on the evidence that she was currently able to work approximately 20 hours per month as an in-home care provider for a 56-year old man, providing house cleaning, shopping and companionship, and that before May 2000, she had worked 10 to 15 hours per week. Tr. 43, 44. The ALJ also discounted Ms. Frazier's testimony about the severity of her mental problems on the grounds that, except for three visits with Dr. Tran, she had

not sought or received ongoing psychiatric care between the summer of 1998 and May 31, 2000, when she began seeing Dr. Ricoy, and had refused to take psychotropic medications until two weeks before the hearing. Tr. 44. The ALJ rejected Ms. Frazier's complaints of pain throughout her body, with swelling in the upper extremities, because these allegations were unsupported by clinical, laboratory or diagnostic findings. Id.

The ALJ found that even though Ms. Frazier was having problems with supervisors and co-workers at the BLM, there was no evidence that she would have been unable to perform other work not involving interaction with these individuals. Tr. 44.

The ALJ rejected Dr. Eliason's March 1999 narrative report on the ground that, while his diagnoses of panic disorder and anxiety found support in the record, his prognosis was of "little value,"in light of the lack of ongoing care or counseling by a mental health practitioner. Id.

On the basis of the VE's testimony, the ALJ found that although Ms. Frazier could not return to her previous work, she retained the residual functional capacity to work at the medium exertion, unskilled jobs identified. The ALJ further supported this finding with reference to the Medical-Vocational Guidelines in Appendix 2 to the regulations, section 203.00 et seq. Under the Guidelines, a younger individual (age 18-44), able to perform work at the medium exertional level who is a high school graduate or more, and whose previous work experience was skilled or semiskilled, but who does not have transferable skills, is

considered not disabled.

## Standards

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results

FINDINGS AND RECOMMENDATION Page 23

from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920. In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). If so, the claimant is conclusively presumed disabled. Yuckert, 482 U.S. at 141. If not, the Commissioner goes to step three.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step

FINDINGS AND RECOMMENDATION Page 24

four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. <u>Yuckert</u>, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the residual functional capacity to do other work in consideration of the claimant's age, education and past work experience. <u>Yuckert</u>, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**Discussion**

Ms. Frazier asserts that the ALJ erred in six respects: 1) failing to credit the opinions of Doctors Eliason and Ricoy that Ms. Frazier's limitations precluded full-time competitive employment; 2) making credibility findings adverse to Ms. Frazier; 3) finding that Ms. Frazier had not been disabled for a year or more; 4) failing to consider the statement of Emily Broussard, dated October 20, 1999, and rejecting the testimony of Mr. Frazier; 5) considering only medical evidence when making the Part B assessment of Ms. Frazier's mental impairments; and 6) failing to properly assess residual functional capacity.

1.    Opinions of Doctors Eliason and Ricoy.

Ms. Frazier contends that the ALJ failed to supply specific and legitimate reasons for not fully crediting the treating physicians, Doctors Eliason and Ricoy.

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the

claimant; 2) those who examine but do not treat; and 3) those who neither examine nor treat. Holohan v. Massanari, 246 F.3d 1195, 1201 (9ᵗʰ Cir. 2001); 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's and an examining physician's opinion carries more weight than a reviewing physician's. Holohan at 1202; 20 C.F.R. § 404.1527(d). In addition, the regulations give more weight to opinions that are explained than to those that are not, Holohan at 1202, see also 20 C.F.R. § 404.1527(d), and to the opinions of specialists concerning matters relating to their specialty over that of nonspecialists, see id. and § 404.1527(d)(5).

Under the regulations, if a treating physician's medical opinion is inconsistent with other substantial evidence in the record, it is still entitled to deference and must be weighted using all the factors provided in 20 C.F.R. § 404.1527. Id. An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if she or he provides "specific and legitimate" reasons supported by substantial evidence in the record. Id. Similarly, if the treating physician's opinion on the issue of disability is controverted, the ALJ must still provide "specific and legitimate" reasons in order to reject the treating physician's opinion. Id.

The ALJ accepted the opinion of Dr. Ricoy that Ms. Frazier's impairments were temporary, but not the remainder of her opinions, including her opinion in the Medical Statement that Ms. Frazier was essentially capable of nothing more than employment in a sheltered

FINDINGS AND RECOMMENDATION Page 26

setting. Because Dr. Ricoy was a treating psychiatrist, the ALJ was required to give "specific and legitimate" reasons for rejecting her opinion on the issue of disability.

Although the ALJ summarized the evidence from Doctors Eliason, Tran, Turco, and Ricoy and stated in his opinion that he "accepted and adopted" the testimony of Dr. Pati, he did not provide any reason for rejecting the diagnosis and opinions of Dr. Ricoy, or those of Dr. Eliason.[4] Tr. 42. I agree with Ms. Frazier that this was error by the Commissioner.

  2. ALJ's rejection of Ms. Frazier's testimony.

Ms. Frazier contends that the ALJ erred in not finding her fully credible. The ALJ's stated reasons for not crediting all of Ms. Frazier's testimony were 1) the absence of any objective medical evidence of a condition which would cause the physical symptoms to which she testified; 2) the absence of evidence that she would have been unable to perform work at BLM that did not involve the co-workers and supervisors of her previous position; 3) her failure to seek counseling and refusal to take psychotropic medications until the spring of 2000, shortly before the hearing,

---

[4] Although Dr. Eliason is an osteopath, not a psychologist or psychiatrist, the record does show that he made a diagnosis and prescribed psychotropic medications. While Dr. Eliason's diagnosis and prognosis are entitled to less weight than that of a psychologist or psychiatrist, it was error for the ALJ to disregard his opinions without any explanation.

FINDINGS AND RECOMMENDATION Page 27

and 4) the inconsistency between her reported symptoms and her ability to work as an in-home care provider, 10-15 hours per week for four months and 20 hours per month thereafter.

### a. Physical symptoms

Once a claimant shows an underlying impairment and a causal relationship between the impairment and some level of symptoms, clear and convincing reasons are needed to reject a claimant's testimony if there is no evidence of malingering. Smolen v. Chater, 80 F.3d 1273, 1281-82 (9th Cir. 1996). The ALJ must identify what testimony is not credible and what evidence undermines the claimant's complaints. Reddick v. Chater, 157 F.3d 715, 722 (9th Cir. 1998). The evidence upon which the ALJ relies must be substantial. Id. at 724; Holohan, 246 F.3d at 1208.

A claimant's testimony about symptoms may be disregarded if it is unsupported by medical evidence which supports the *existence* of the symptom, although the claimant need not submit medical evidence which supports the *degree* of the symptom. Bunnell v. Sullivan, 947 F.2d 341, 347 (9th Cir. 1991)(en banc).

Ms. Frazier testified that she suffered from headaches, nausea, a bulging sensation in her stomach, body aches, and severe fatigue. However, despite multiple diagnostic tests over several years, Dr. Eliason was unable to determine any physical cause for these complaints. Because there was no medical evidence to support the existence of these symptoms, the ALJ's rejection of this testimony was not erroneous.

FINDINGS AND RECOMMENDATION Page 28

b. Absence of evidence that she would be unable to
        perform work that did not involve her BLM co-workers and
        supervisors

Ms. Frazier's medical history shows consistently that she attributed her mental symptoms to the problems with her co-workers and supervisors at the BLM. See, e.g.: tr. 309 (Dr. Eliason's note in August 1998, "tells me she has had this ongoing problem with work... where co-workers make comments, supervisors have made comments that make her feel uncomfortable"); 308 (Dr. Eliason's diagnosis in August 1998 of "anxiety related to work"); 279 (Dr. Tran's notation on August 17, 1998, "[L]eading up to current situation were episodes at work..."), 281 (Dr. Tran's notation on August 27, 1998, "No anxiety attacks unless she thinks about work or talks to her workplace"), 303 (Dr. Eliason's note in March 1999, "Her medicine seems to be helping her some, but she gets fairly upset even thinking about the idea of returning to work."), 328 (Dr. Turco's notation, in July 1999: "She feels that she could return to a job, but not with the same individuals"). The ALJ's finding is supported by substantial evidence.

        c. Failure to seek or follow through with treatment

The ALJ did not credit Ms. Frazier's testimony about debilitating depression and anxiety because of evidence in the record that she had been noncompliant in taking Paxil and Xanax for those symptoms, and because the medical evidence showed no ongoing treatment except for three sessions with Dr. Tran, until Ms. Frazier sought treatment with Dr. Ricoy two years after the onset

of her symptoms. These are legitimate credibility findings. The record shows that between the onset of her symptoms in July 1998 and the commencement of treatment with Dr. Ricoy in May 2000, a period of almost two years, the only counseling Ms. Frazier sought was three sessions with Dr. Tran in August 1998.[5] Further, Ms. Frazier told Dr. Turco in July 1999 that she had stopped taking the Paxil and Xanax Dr. Eliason had prescribed; she did not resume psychotropic medications until May 2000. This finding is based on substantial evidence in the record.

> d. Inconsistencies between reported symptoms and part-time work

Ms. Frazier testified that she suffers from anxiety and panic attacks, as well as an inability to get along with anyone. She stated that she was unable to spend more than five minutes at a time in a store, because she felt that people were trying to hit her with their carts or that cashiers would refuse to wait on her. But Ms. Frazier's reported activities as an in-home caregiver, whose duties included providing companionship and grocery shopping for her clients, are inconsistent with an inability to get along with anyone or spend more than five minutes in a store. The ALJ's rejection of Ms. Frazier's testimony on this basis was not erroneous. See <u>Orteza v. Shalala</u>, 50 F.3d 748 (9th Cir. 1995)(in determining credibility of symptom testimony, ALJ may consider unexplained absence of treatment).

> 3. Finding that Ms. Frazier had not been disabled for a year

---

[5] See footnote 1.

or more.

Ms. Frazier contends that the ALJ erred in finding that she had not met her burden of showing that she had been disabled for a year or more. I agree. The ALJ adopted the testimony of the medical expert, Dr. Pati. Dr. Pati's testimony was that Ms. Frazier was unable to work full-time after April or May 2000, but that he expected her to be able to work full-time by May 2001.

A claimant establishes disability by showing an inability to engage in substantial gainful activity by reason of an impairment which has lasted or is expected to last at least a year. 42 U.S.C. § 423(d)(1)(A). Disability turns upon the claimant's capacity for work activity on a regular and continuing basis, Irwin v. Shalala, 840 F. Supp. 751 (D. Or. 1993), which means the ability to work an eight-hour day. Ratto v. Secy, 839 F. Supp. 1415 (D. Or. 1993). The ALJ's adoption of Dr. Pati's opinion that Ms. Frazier had not been capable of full-time work activity since April or May 2000, and that he expected her to be able to resume full-time work activity by May 2001, contradicted his finding that Ms. Frazier had not met her burden of showing that she had been disabled for a year or more.

4. ALJ's failure to consider written statement of Emily Broussard and rejection of Mr. Frazier's testimony

Lay testimony as to a claimant's symptoms is competent evidence which the Secretary must take into account, Dodrill v. Shalala, 12 F.3d 915, 919 (9th Cir. 1993) unless he expressly determines to disregard such testimony, in which case "he must give

FINDINGS AND RECOMMENDATION Page 31

reasons that are germane to each witness." _Id_. While lay witnesses are not competent to testify to medical diagnoses, they may testify as to a claimant's symptoms or how an impairment affects ability to work. _Nguyen v. Chater_, 100 F.3d 1462 (9th Cir. 1996).

The ALJ gave no reason for rejecting the testimony of Mr. Frazier, which he found "only partially credible." The ALJ made no reference to the written statement of Ms. Broussard. This was error.

### 5. ALJ's Part B assessment

Ms. Frazier argues that the ALJ erred in his step three determination that her impairments did not meet or equal one of the listed impairments because he failed to consider all relevant evidence, not just medical evidence. Specifically, Ms. Frazier contends that the ALJ should have considered the statements of herself, her husband, Ms. Broussard, and the records relating to her employment at the BLM.

Step three of the sequential evaluation asks whether the claimant's impairment "meets or equals" one of a list of specific impairments described in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "List of Impairments"). When dealing with alleged mental disabilities, this inquiry has two parts. In the first part (Part A), the ALJ must look to the medical evidence only, to determine whether the presence of a mental disorder is medically substantiated. _Schneider v. Commissioner_, 223 F.3d 968, 974 (9th Cir. 2000). In the second part (part B), the ALJ must determine whether the "severity" of the claimant's "functional limitations"

are "incompatible with the ability to work." 20 C.F.R. pt. 404, subpt. P., app. 1, § 1200A. For this determination, the ALJ can use information from both medical and non-medical sources, including work evaluations and observations by people who have knowledge of the individual's functioning. <u>Schneider</u>, 223 F.3d at 975. Failure to consider such evidence when it is in the record is error. <u>Id.</u>

The ALJ did not err in failing to consider the testimony of Ms. Frazier, including her statements to the BLM, because he found her testimony not credible for reasons that were supported by substantial evidence in the record. However, the ALJ's failure to address the statements of Ms. Broussard and Mr. Frazier was legal error.

6. Failure to properly assess residual functional capacity

Ms. Frazier contends that the ALJ failed to properly assess her residual functional capacity because he disregarded Dr. Ricoy's assessment of specific limitations, as well as finding her capable of performing work on a full-time basis. I agree that the ALJ failed to make a proper assessment. The ALJ adopted the opinions of the testifying medical expert, Dr. Pati, but Dr. Pati unequivocally testified that Ms. Frazier was not currently capable of full-time employment and would not be able to resume full-time employment for approximately a year. See tr. 450, 456.

7. Remand for benefits or further proceedings

Ms. Frazier urges the court to remand this case with an order to award benefits because the opinions of Dr. Eliason and the lay evidence show that she has been disabled since she left her

employment at the BLM. She urges the court to accept the functional limitations found by Dr. Ricoy, which would preclude employment in any but a sheltered setting.

The decision whether to remand for further proceedings turns upon the likely utility of such proceedings. Harman v. Apfel, 211 F.3d 1172, 1179 (9th Cir. 2000). A remand for further proceedings is unnecessary if the record is fully developed and it is clear from the record that the ALJ would be required to award benefits. Holohan, 246 F.3d at 1210. In cases in which it is evident from the record that benefits should be awarded, remanding for further proceedings would needlessly delay effectuating the primary purpose of the Social Security Act-i.e., to give financial assistance to disabled persons because they cannot sustain themselves. Id.

In Smolen v. Chater, 80 F.3d 1273, 1292 (9th Cir. 1996), the court held that improperly rejected evidence should be credited and an immediate award of benefits be made when: 1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

If the Smolen test is satisfied, then remand for payment of benefits is warranted regardless of whether the ALJ *might* have articulated a justification for rejecting the doctor's opinion. Harman at 1173 (emphasis in original).

I am not persuaded that the Smolen test is satisfied in this

FINDINGS AND RECOMMENDATION Page 34

case, because the evidence provides a number of outstanding issues which preclude accepting the opinions of Doctors Ricoy and Eliason.

Dr. Ricoy's findings in the Medical Statement are vitiated or flatly contradicted by the evidence that Ms. Frazier was able to engage in part-time employment as an in-home care provider. Ms. Frazier's ability to perform this work, which included house cleaning, laundry, and shopping for an elderly or disabled person for four hours at a time, is completely inconsistent with most of Dr. Ricoy's findings, such as that Ms. Frazier was essentially unable to understand, remember and carry out very short and simple instructions; get along with others without exhibiting behavioral extremes; make simple work-related decisions; be aware of normal hazards and take appropriate precautions; respond appropriately to changes in a routine work setting; maintain attention for two hour periods; sustain ordinary routine without special supervision; and work in proximity to others. These limitations as found by Dr. Ricoy are also inconsistent with her comment that Ms. Frazier "may be able to handle part-time work." Tr. 381.

Further, Dr. Ricoy had only been in a treatment relationship with Ms. Frazier for four sessions over approximately six weeks when she completed the Medical Statement. Dr. Ricoy had not yet administered any diagnostic tests, and Ms. Frazier had not at that time begun taking psychotropic medications. Both Dr. Turco and Dr. Pati thought medications would alleviate Ms. Frazier's symptoms. Dr. Ricoy also opined that Ms. Frazier's impairments were temporary. Remand will enable the ALJ to consider whether Ms.

Frazier did in fact improve by May 2001, as Dr. Pati predicted.

These issues preclude finding Ms. Frazier disabled on the basis of the opinions of Doctors Eliason and Ricoy. I recommend, therefore, that this case be remanded for further proceedings, and that the ALJ be instructed to 1) reconsider the opinions of Doctors Eliason and Ricoy; 2) determine whether the testimony of Dr. Pati required a finding that Ms. Frazier had been disabled for a closed period of at least one year; 3) reopen the record to assess whether Ms. Frazier's mental impairments were improved by medication and therapy; 4) consider the lay witness testimony of Mr. Frazier and Ms. Broussard; 5) make a proper Part B assessment; and 6) make a proper assessment of Ms. Frazier's residual functional capacity.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due March 29, 2005. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due April 12, 2005, and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 14th day of <u>March</u>, 2005.

/s/   Dennis J. Hubel

Dennis James Hubel
United States Magistrate Judge

FINDINGS AND RECOMMENDATION Page 36